**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| J&J Sports Productions, Inc., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13 C 5931 |
| v. ) | |
| ) | Judge Virginia M. Kendall |
| Stephen Dabrowski, individually, and Bedford ) | |
| Café, Inc. d/b/a Buzz Bomb, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff J&J Sports Productions, Inc., a California corporation, brought a two-count complaint against Defendants Stephen Dabrowski and Bedford Café, doing business as Buzz Bomb, on August 20, 2013, alleging that the Defendants violated the Federal Communications Act. Specifically, J&J contends that Dabrowski, the owner of Bedford Café, knowingly acted in violation of 47 U.S.C. § 605 and 47 U.S.C. § 553 by unlawfully intercepting and exhibiting a television broadcast to which J&J had exclusive distribution rights. On May 15, 2015, J&J filed a motion for summary judgment (Dkt. No. 20) pursuant to Federal Rule of Civil Procedure 56(a). The Court grants in part and denies in part J&J's motion. Because the record is devoid of any evidence demonstrating Dabrowski's individual involvement, the Court denies the motion with respect to him. However, the Court grants summary judgment against Bedford Café because it is undisputed that the broadcast was exhibited at the establishment and Bedford Café offered no evidence from which a reasonable jury could conclude that it paid for the program.

## BACKGROUND

At all relevant times, J&J was an international distributor of televised pay-per-view sporting events to the hospitality industry and Bedford Café was a corporation doing business as a restaurant and bar under the name of Buzz Bomb, located at 6301 West 73rd Street, Bedford Park, Illinois. (Dkt. No. 22, Pl.'s 56.1 St. ¶ 5; Dkt. No. 1, Compl. ¶ 11.) Dabrowski was the owner of Bedford Café from approximately 2006 to March 13, 2015, when the corporation was involuntarily dissolved. (Pl.'s 56.1 St. ¶ 3; Dkt. No. 35, Def.'s Add'l Facts ¶ 19.)

J&J held exclusive nationwide television distribution rights by contract to the prize fight *"Star Power": Floyd Mayweather, Jr. v. Victor Ortiz Championship Fight Program* ("the Program")[1] and all undercard fights and commentary in the television broadcast associated with that event that took place on September 17, 2011. (Pl.'s 56.1 St. ¶ 4; Ex. C; Ex. D.) As a result, J&J entered into sub-licensing agreements granting commercial establishments the rights to publicly show the Program to patrons. (Dkt. No. 23, Pl.'s Memo in Supp. of Mot. for Summ. J. at 2.) According to a rate card furnished by J&J, the commercial rate to broadcast the Program for an establishment with a capacity of 101 to 200 patrons on September 17, 2011 was $4,200.[2] (Pl.'s 56.1 St., Exh. E).

J&J hired private investigator Andres Aguilar to visit Buzz Bomb on the day of the Program broadcast. (Pl.'s 56.1 St. ¶ 5.) In Aguilar's affidavit, he attests to arriving at Buzz Bomb around 8:20 p.m., paying a ten dollar cover charge, and staying for half an hour. (Dkt. No. 22, Ex. A, Aguilar Aff. at 1-2.) During his time in the bar, Aguilar observed seven televisions[3]

---

[1] Throughout the briefing, the Defendants dispute that the Program is the same as "the event" named in the license agreement. *See* Dkt. No. 22, Ex. C. This is a distinction without a difference. Both terms concern the prize fight and undercard fights at issue.
[2] The attached rate card refers to G&G Closed Circuit Events. J&J utilized this company to sell the licenses to commercial locations. (Dkt. No. 38, Pl.'s Add'l Facts ¶ 9; Ex. 2.)
[3] Dabrowski testified that Buzz Bomb had six televisions, not seven. (Dabrowski Dep. at 36.)

exhibiting the Josesito Lopez v. Jessie Vargas fight, an undercard fight included in the Program package. (*Id.*; Pl.'s 56.1 St. ¶ 7.) He also conducted three headcounts, noting the presence of 22, 25, and 31 people in the establishment at different times. (Aguilar Aff. at 2.) Aguilar estimated the capacity of the establishment was about 200 patrons, whereas Dabrowski stated he believed Buzz Bomb had a capacity of between 100 and 150 people. (*Id.*; Dabrowski Dep. 33:18-34:2.)

While the Defendants concede that the Program was shown at Buzz Bomb on September 17, 2011, they deny obtaining or exhibiting it unlawfully. (Def.'s Resp. to Pl.'s Req. to Admit, ¶¶ 10, 37.) However, neither Defendant provided any evidence that they ever contracted to show the Program or paid the commercial rate of $4,200 to J&J for exhibition. Additionally, the Defendants originally admitted they knew that payment of a fee was required to exhibit the Program at a commercial establishment, but now deny any such knowledge on the basis that the Request to Admit did not note that "the Program" and "the Event" named in the licensing agreement were the same. (Defs.' 56.1 Resp. St. ¶ 14.)

J&J contends that Dabrowski participated in and had control over the exhibition of pay-per-view events in his establishment. Dabrowski denies any involvement in the incident and contends that the manager at the time, Perry Mallarias, was responsible for the showing of the Program as well as all other operations of the establishment that night. (*Id.* at ¶ 3.) Dabrowski testified that he was not in the restaurant on September 17, 2011, did not order the Program, and did not take any profit from the restaurant that night. (*Id.* at ¶¶ 3, 12, 17.)

## **LEGAL STANDARD**

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of the law. *See* Fed. R. Civ. P. 56(a). A material fact is

3

a fact that is "identified by the substantive law as affecting the outcome of the suit." *Bunn v. Khoury Enters. Inc.,* 753 F.3d 676, 681 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue in the context of a motion for summary judgment cannot simply be a "metaphysical doubt as to the material facts" but rather exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see also Flint v. City of Belvidere*, 791 F.3d 764, 769 (7th Cir. 2015). If the movant is able to provide specific evidence or point to an absence of evidence to support the non-moving party's case, the non-moving party cannot rely on conclusory statements but "must set forth specific facts showing that there is a genuine issue for trial." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014); Fed. R. Civ. P. 56(e). While a court must draw reasonable inferences that favor the non-moving party, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 656 (7th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255). Summary judgment will be granted if the non-moving party does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

## **DISCUSSION**

J&J originally contended that the Defendants violated two federal statutes, 47 U.S.C. § 605 and 47 U.S.C. § 553, by misappropriating the broadcast. However, J&J now moves for summary judgment under Section 605 only.[4] Section 605 contains four clauses prohibiting:

---

[4] It is well established that 47 U.S.C. § 605 and 47 U.S.C. § 553 are mutually exclusive statutes, as the Seventh Circuit has held that the former applies only to satellite or radio transmittal and the latter applies to cable systems. *United States v. Norris*, 88 F.3d 462, 469 (7th Cir. 1996). Therefore, a defendant cannot be liable under both statutes

4

> (1) the unauthorized interception and divulging of wire or radio communications by operators responsible for receiving such communications; (2) the unauthorized interception and divulging of wire or radio communications; (3) the unauthorized receipt and use of wire or radio communications for the benefit of the unauthorized receiver or someone else not entitled to the communication; and (4) the divulging, publication, or use of unlawfully intercepted information by anyone knowing that the information was wrongfully obtained.

*Norris*, 88 F.3d at 465. This statute has been generally interpreted to prohibit commercial establishments from intercepting and broadcasting satellite television programming. *Cf. Id.* at 466-67; *Lynch*, 822 F. Supp. 2d at 805.

### A. Motion for Summary Judgment Against Bedford Café

At the outset, the Court notes that although J&J moved for summary judgment against both Bedford Café and Dabrowski, it did not address each defendant individually in its motion. Nevertheless, the Court considers this motion as to each of the defendants named in the complaint separately, beginning with Bedford Café. J&J alleges that Bedford Cafe violated Section 605 by "knowingly and willfully obtain[ing] the Program and exhibit[ing] [it] in the Establishment without authorization and for the Defendant's economic benefit." (Pl.'s Memo in Supp. of Mot. for Summ. J. at 10.)

In a somewhat puzzling and inconsistent set of allegations, J&J first accuses Bedford Café of "[paying] the residential rate in order to avoid paying the commercial rate for the Program" (Dkt. No. 20, Pl.'s Mot. for Summ. J. ¶ 11) but then alludes to the notion that Bedford Café actually unscrambled signals or used a "blackbox" to obtain the encrypted broadcast (Pl.'s Memo in Supp. of Mot. for Summ. J. at 7.) Finally, J&J contends "Defendants intercepted the broadcast of the Program illegally by using a DirecTV satellite box and showed it to Defendant's

---

for the same act. *See, e.g.*, *Joe Hand Promotions, Inc. v. Lynch*, 822 F. Supp. 2d 803, 805 (N.D. Ill 2011). Given the fact that the Defendants state the establishment had a satellite system, this motion is correctly brought under § 605.

patrons….” (*Id.*) Despite J&J's varying theories of liability, either paying the residential rate for a commercial establishment or using a blackbox to obtain the Program would violate the statute. *See, e.g.*, *Joe Hand Promotions, Inc. v. Zani*, No. 11 C 4319, 2013 WL 5526524, at *2 (N.D. Ill. Oct. 7, 2013) ("Defendants violated § 605(a) when they commercially published the Event after having been charged only the residential rate."); *J&J Sports Prods., Inc. v. Zarco*, No. 1:12-CV-01642-TAB-JMS, 2013 WL 4829222, at *2 (S.D. Ind. Sept. 9, 2013).

Whichever method obtained the broadcast of the Program, it is undisputed that Bedford Café displayed the Program and failed to pay the proper fee for commercial use of the broadcast. This fact alone is enough for summary judgment in favor of J&J. *See, e.g.*, *Zani*, 2013 WL 5526524, at *2 (summary judgment deemed appropriate because Section 605 "essentially" provided for strict liability and defendants did not pay commercial fee for use of broadcast but publicized broadcast to patrons anyway). Bedford Café's argument that because it had a satellite television system installed at the restaurant and its manager was able to order pay-per-view events, there exists a dispute as to whether the entity received the Program unlawfully, is unavailing. *See, e.g.*, *J&J Sports Prods., Inc. v. Pantchev*, No. 12 C 1647, 2013 WL 6050168 (N.D. Ill. Nov. 15, 2013) (where defendant had a commercial account with Dish Network and Dish Network knew that defendant was a commercial establishment, yet charged defendant residential rate, defendant was theoretically authorized to broadcast event to patrons). Here, Bedford Café has provided no evidence of a commercial account with its television provider or that its provider was aware it was a commercial establishment. In fact, the record contains no evidence tending to show that the Program was ever properly ordered at all. Without any facts demonstrating the circumstances of how the Program was shown in the restaurant, Bedford Café's unsubstantiated argument that it may have lawfully provided the Program does not create

a material issue of fact. *See Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014) ("At the summary judgment stage of a proceeding, a plaintiff must put up or shut up and show what evidence he has that would convince a trier of fact to accept his version of events.") (citation and internal quotation marks and annotation omitted).

Whereas J&J has presented evidence through Aguilar's affidavit that Bedford Café exhibited the Program[5] willfully on at least six television screens in the establishment without paying the commercial rate, Bedford Café has not produced any evidence to the contrary despite maintaining it was not done so unlawfully. "Once a party has made a properly supported motion for summary judgment, the non-moving party may not simply rest upon the pleadings but must instead submit evidentiary materials that set forth specific facts showing there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citation and internal quotation marks omitted). Here, Bedford Café has not submitted any non-pleading evidence indicating that it received the Program lawfully—apart from Dabrowski's affidavit and testimony—neither of which is adequate to construct a genuine dispute of fact given his absence from Bedford Café on the day of the incident. *See Ledbetter v. Good Samaritan Ministries*, 777 F.3d 955, 957 (7th Cir. 2014) (to properly oppose summary judgment, affidavit must be based on personal knowledge). The Court therefore grants summary judgment against Bedford Café.

B.  **Motion for Summary Judgment Against Dabrowski**

As for the other defendant, J&J seeks to hold Dabrowski individually liable for violating Section 605 as the corporate officer of Bedford Café. To hold an individual liable under Section 605, J&J needed to develop the theory that Dabrowski was "vicariously liable" for the unauthorized receipt and exhibition of the boxing program. *See, e.g.*, *J&J Sports Prods. Inc. v.*

---

[5] Not only did J&J provide evidence that Vargas v. Lopez was an undercard fight to the Mayweather v. Ortiz fight on September 17, 2011, it also submitted a video taken by Aguilar corroborating his presence at Buzz Bomb. (Pl.'s 56.1 St., Exh. D, Exh. G.)

7

*Resendiz*, No. 08 C 4121, 2009 WL 1953154, at *2 (N.D. Ill. July 2, 2009). In assessing the propriety of imposing individual liability on a corporate officer under Section 605, courts commonly apply the criteria of the copyright benefit-and-control test. *See generally J&J Sports Prods. v. Perez*, No. 12 C 8256, 2014 WL 3805818, at *2 (N.D. Ill. Aug. 1, 2014); *Joe Hand Promotions, Inc. v. Bragg*, No. 13 C 02725, 2014 WL 2589242, at *5 (S.D. Cal. June 10, 2014); *Joe Hand Promotions, Inc. v. Double Down Entm't, LLC*, No. 11 C 02438, 2014 WL 994382, at *3-4 (D.S.C. Mar. 13, 2014). To satisfy that test, an individual who has the right and ability to supervise the unlawful interception and had a financial interest in it, or an individual who personally participated in the unlawful interception, may be liable. *See Perez*, 2014 WL 3805818, at *2*; see also, e.g.*, *J&J Sports Prods. v. Ruiz*, No. 14 CV 2973, 2015 WL 587060, at *3 (N.D. Ill. Feb. 11, 2015) ("Courts generally find allegations are sufficient to allege individual liability where the defendant was personally involved in the unlawful interception—or had supervisory capacity or control of the place where the interception occurred—and benefited financially from the interception."). The Court notes that this District has questioned whether this test is appropriate applied to Federal Communications Act cases. *See, e.g.*, *Resendiz*, 2009 WL 1953154, at *2 n. 1. ("[W]e are skeptical that the doctrine…should be extended to broadcast piracy actions.").

Nevertheless, the Court analyzes J&J's motion for summary judgment with regard to Dabrowski as an individual. Dabrowski did not personally participate in the unlawful interception; the parties do not dispute that he was not present in the restaurant on September 17, 2011. (Pl.'s Resp. to Defs.' Additional Facts, ¶ 17.) Without personal involvement, J&J must conclusively demonstrate that Dabrowski had the right and ability to supervise the unlawful interception of the Program and that he gained financially from it. *See, e.g.*, *Perez*, 2014 WL

3805818, at *2. J&J has failed to do so. To establish that Dabrowski had the right and ability to supervise the interception of the Program, J&J offered nothing more than the following facts: (1) Dabrowski admitted he was the owner and officer of Bedford Café on September 17, 2011; (2) Dabrowski was an individual with supervisory capacity and control over the activities occurring within the restaurant on September 17, 2011 and; (3) the restaurant exhibits television programming that is believed to be of interest to its patrons. (Pl.'s Mot. for Summ. J., ¶¶ 16, 19.) These facts, taken individually or in tandem, are insufficient to warrant the imposition of individual liability.

Facts supporting an individual's right and ability to supervise must point to control over the infringing conduct itself, rather than merely demonstrate ownership of the establishment. *See, e.g.*, *Joe Hand Promotions, Inc. v. Sharp*, 885 F. Supp. 2d 953, 957 (D. Minn. 2012) ("an individual defendant who has the right and ability to supervise the violations and a strong financial interest in the activity may be liable under the FCA, but in order to show individual liability, allegations of ownership of the establishment, without more, are insufficient.") (citation and internal quotation marks and annotation omitted) (collecting cases); *J&J Sports Prods., Inc. v. Walia*, No. 10-5136 SC, 2011 WL 902245, at *3 (N.D. Cal. Mar. 14, 2011) (to satisfy the right and ability to supervise prong, plaintiff must demonstrate that defendant "had supervisory power over the infringing conduct itself"). Here, J&J has not established that no genuine dispute of material fact exists regarding whether Dabrowski's involvement satisfies the right to control prong of the test. Dabrowki denies that he had supervisory capacity and control over the activities that occurred that night, referencing his deposition testimony in which he stated that the restaurant's manager at the time had the authority to order pay-per-view events and did so in this case without asking for permission. (Dabrowski Dep. at 59:24-60:4, 60:11-15.) J&J contends that

9

Dabrowski hired Mallarias to manage the restaurant and therefore approved of all his actions. (Pl.'s Resp. to Def.'s Additional Facts, ¶¶ 6-8.) But there is no evidence that Dabrowski decided the Program be aired, condoned it, or that he was even aware the Program was displayed in the restaurant until after the fact. In fact, Dabrowski maintains that he was only made aware of the incident when he received notice of this lawsuit. (Dabrowski Dep. at 39:15-40:1.)

Unlike owners of sole proprietorships, a shareholder's actions can be separated from those of the corporation. *Garden City Boxing Club, Inc. v. Dominguez*, No. 04 C 0351, 2006 WL 1517775, at *5 (N.D. Ill. May 23, 2006) (individual defendant held personally liable because "[a] sole proprietor is personally responsible for actions committed by his employees within the scope of their employment" and a sole proprietorship does not have a legal identity separate from that of the owner). Because a reasonable jury could find that Dabrowski did not have supervisory capacity and control over the unlawful interception of the Program itself, a genuine dispute of material fact precludes summary judgment against him.

Even if J&J had established the control prong of the test, it failed to definitively show that Dabrowski benefitted from the broadcast of the Program. To show evidence of "direct financial interest," J&J must demonstrate more than the fact that Dabrowski was a shareholder who gained benefits simply from the profits of Bedford Café. *See, e.g.*, *Walia*, 2011 WL 902245 at *3 ("[A]n individual's status as a shareholder or officer is insufficient to show that he or she had the requisite supervision authority or financial interest to warrant individual liability."). Whether Dabrowski received direct financial interest remains disputed: while J&J argues that Dabrowski's deliberate advertisement of the Program coupled with his knowledge of the patrons' viewing preferences is evidence of financial gain, Dabrowski maintains that he did not close out the cash registers that night or retain a salary from Bedcafe Café. (Dabrowski Aff., ¶¶ 5, 7.)

Furthermore, J&J has offered no evidence that Dabrowski derived any direct financial benefit from the profits of the broadcast of the Program, or if any profits were derived at all. *See id.* ("a plaintiff cannot merely allege that the shareholders profit in some way from the profits of the corporation."). For these reasons, J&J's motion for summary judgment with respect to Dabrowski is denied.

### C. Damages

Having established Bedford Café's liability under 47 U.S.C. § 605(a), the Court turns to the calculation of damages against Bedford Café. J&J seeks statutory damages in the amount of $25,200, a deterrence amount of $5,000, and fees and costs. (Pl.'s Mot. for Summ. J. at 5.)

47 U.S.C. § 605(e)(3)(C)(i)(II) governs calculations of statutory damages by a civil court presiding over a claim under this statute:

> The party aggrieved may recover an award of statutory damages for each violation of subsection (a) of this section involved in the action in a sum of not less than $1,000 or more than $10,000, as the court considers just, and for each violation of paragraph (4) of this subsection involved in the action an aggrieved party may recovery statutory damages in a sum not less than $10,000, or more than $100,000 as the court considers just.

Furthermore, 47 U.S.C. § 605(e)(3)(C)(ii) states:

> In any case in which the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage of private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each violation of subsection (a) of this section.

But, alternatively, "[i]n any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $250." 47 U.S.C. § 605(e)(3)(C)(iii). The Court maintains wide discretion in determining the amount of statutory damages to be

awarded. *See Dominguez*, 2006 WL 1517775 at *4 (citing *Cable/Home Commc'n Corp. v. Network Prods.*, 902 F.2d 829, 852 (11th Cir. 1990)).

In arriving at the $25,200 figure, J&J applies a multiplier of six to the baseline rate of $4,200 (the original fee from the rate card) to account for advertisement of the Program and implementation of a cover charge on the night of September 17, 2011. (Pl's Memo in Supp. of Mot. for Summ. J. at 10.) The statute itself only sets a maximum recovery, but in considering the amount to award for enhanced damages due to willfulness, courts have considered a number of factors, including: "(1) the number of violations; (2) defendants' unlawful monetary gains; (3) plaintiffs significant actual damages; (4) whether defendant advertised for the event; and (5) whether the defendant collected a cover charge on the night of the event." *J&J Sports Prods. v. Smith*, No. 14 C 2955, 2014 WL 3811090, at *3 (N.D. Ill. July 31, 2014).

Bedford Café contends that there are four disputes regarding the damages award: what the proper baseline should be, whether the violation was willful, whether damages should be based on per person viewing or maximum occupancy of the restaurant, and whether a cover was charged to watch the Program at Buzz Bomb on September 17, 2011. (Def.'s Memo in Supp. of Resp. in Opp. to Pl.'s Mot. for Summ. J. at 7-9.) No argument has merit.

Given that J&J submitted a rate card setting the fees that a commercial establishment would have had to pay, it is appropriate to utilize the $4,200 rate[6] as a baseline based on both Aguilar's and Dabrowski's estimates that the restaurant had a capacity between 101-200 patrons. (Pl.'s 56.1 St. Ex. E; Dabrowski Dep. at 33:18-34:2.) Bedford Café refers to a case from a New

---

[6] Bedford Café also takes issue with the rate card as it comes from a company called "G & G Closed Circuit Events," but as stated above, J&J has adequately addressed the issue by noting that it utilized this company to sell closed-circuit licenses to commercial locations throughout the United States and providing an affidavit from J&J's President attesting to as much. (Pl.'s Add'l Facts ¶ 9; Ex. 2.)

12

York District Court[7] in contending that a "per-patron valuation" should be used when the record provides the number of patrons present, but courts in this district have utilized the baseline method when that information is available from a rate card. *See Smith*, 2014 WL 3811090 at *3 ("While other courts have determined a set sum per patron…the plaintiff here has submitted a rate card…" thus using the baseline to calculate statutory damages); *cf. That's Entertainment v. Old Bridge Tavern*, No. 94 C 2612, 1996 WL 148045, at *3 (N.D. Ill. Mar. 28, 1996) ("In fashioning an appropriate damages award, evidence regarding the fee Old Bridge should have paid would have been helpful.").

As to the willfulness of Bedford Café's actions, the record demonstrates that it acted with "disregard for the governing statute and an indifference for its requirements." *ON/TV v. Julien*, 763 F.2d 839, 844 (7th Cir. 1985) (internal quotation marks omitted). Most notably, Bedford Café admitted it was aware that a fee had to be paid to J&J in order to broadcast the Event in the Establishment but produced no evidence of that payment. (Defs.' Resp. to Pl.'s St. ¶ 13.) It is also clear that Bedford Café was aware that a licensing fee had to be paid in order to show the fight commercially and broadcasted the Program to obtain financial gain, despite its questionable argument that "the Event" was never defined as "the Program." Moreover, Bedford Café has had ample opportunity to introduce evidence demonstrating that it paid the residential rate (or any rate at all) for the Program, yet has failed to do so. *Cf. Joe Hand Promotions v. Legg*, No. 11 C 4307, 2012 U.S. Dist. LEXIS 125886, at *7 (N.D. Ill. Sept. 5, 2012) (evidence of payment of residential rate created "a plausible inference that could allow a jury to find that . . . [the defendant] reasonably believed he was properly paying for the commercial use."). Accordingly, the Court concludes that Bedford Café's broadcast of the Program was willful.

---

[7] *Time Warner Cable v. Taco Rapido Restaurant*, 988 F. Supp. 107, 111 (E.D.N.Y. 1997).

Finally, Bedford Café argues that whether a cover was charged on the night of the Program is disputed. The only evidence Bedford Café offers to counter Aguilar's affidavit stating that he paid a cover is from Dabrowski's deposition testimony. Dabrowski admitted that he was not present at the restaurant on September 17, 2011 and would therefore have no personal knowledge of the events of that night. With no admissible evidence tending to show that patrons were not charged a cover the night of the Program, Bedford Café is unable to manufacture a genuine dispute concerning this issue. *See Ledbetter*, 777 F.3d at 957.

Given that the record establishes that Bedford Café willfully showed the Program on at least six televisions in violation of Section 605, advertised the broadcast, and charged a cover for entrance into the restaurant, the Court finds that a multiplier of five is appropriate under the circumstances. *See, e.g.*, *Smith*, 2014 WL 3811090 at *4 (multiplier of four applied when defendants displayed the program on four televisions, charged a ten-dollar cover, and willfully intercepted the program); *see also Kingvision Pay-Per-View, Ltd. v. Scott E's Pub, Inc.*, 146 F. Supp. 2d 955, 961 (E.D. Wisc. 2001) (enhanced damages of five times base amount found to be appropriate because defendant advertised the event, charged a cover, showed the event on five monitors, and violated the statute willfully). Finally, J&J's request for additional deterrence in the amount of $5,000 is denied. The Court has found no precedent of awarding separate damages for deterrence and J&J has not offered any case law that demonstrates its appropriateness here. Rather, the enhanced damages multiplier of five already serves to deter future violations of the same offense. *See Smith*, 2014 WL 3811090 at *4 (deterrence factor included in the enhanced damages of four times the baseline award); *see also Time Warner v. Googies Luncheonette*, 77 F. Supp. 2d 485, 491 (S.D.N.Y. 1999) ("A factor of three times the base award should serve as a reasonable deterrent against future violations.").

## **CONCLUSION**

For the reasons stated above, the Court grants J&J's motion for summary judgment against Bedford Café and finds an award in the amount of $21,000, in addition to reasonable attorney's fees and costs, appropriate. The Court denies summary judgment with respect to Dabrowski.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:  12/22/2015